DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Edmund Elwell, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.
 I. {¶ 2} This case arises out of the untimely death of Kimberly Dove ("Ms. Dove") on March 6, 2005. At the time of Ms. Dove's death, she and Appellant had been dating for approximately eight years. Ms. Dove had a daughter by a previous relationship. Although Ms. Dove had lived with Appellant, the two were not residing together on the date of the incident. At the time, Ms. Dove was residing with her parents and her daughter a few miles from Appellant's home. *Page 2 
Appellant contends that both he and Ms. Dove abused drugs and often argued about one another's drug use. Ms. Dove's family disputes that she abused drugs.
 {¶ 3} On the night of March 6, 2005, Ms. Dove arrived at Appellant's house in Lorain County some time between 8:30 and 9:00 p.m. Ms. Dove brought Appellant dinner. Shortly after arriving, Ms. Dove and Appellant began arguing. Appellant contends that Ms. Dove went into the bedroom and began berating him about his drug use. Appellant contends that the two engaged in a scuffle wherein they both grabbed each other's hair and banged heads. Appellant then grabbed a bat and smashed a ceramic frog that had been sitting on top of the television set. He then swung the bat at the wall, leaving a few holes. Appellant contends that, at that point, Ms. Dove picked up a shotgun and approached him. He claims that he grabbed the stock-side of the gun, at which point the gun discharged. The State contends that Appellant shot Ms. Dove. The parties agree that after Ms. Dove was shot, Appellant fled the scene, eventually arriving at a motel in Garfield Heights where the police arrested him on March 7, 2005.
 {¶ 4} When Ms. Dove did not arrive home as expected on March 6, 2005, her parents and daughter became concerned that something had happened to her. When she did not arrive home by early the next morning, her father alerted the police. The police eventually entered Appellant's home and discovered Ms. Dove lying on the floor in a back bedroom. The police immediately determined that Ms. *Page 3 
Dove was dead and that she had been dead for some time as her body was cold and rigor mortis had set in.
 {¶ 5} On March 16, 2005, Appellant was indicted by the Lorain County Grand Jury on four counts including one count of murder in violation of R.C. 2903.02(A), a felony of the first degree; one count of felony murder in violation of R.C. 2903.02(B), a felony of the first degree; one count of felonious assault in violation of R.C. 2903.11(A)(1) (2), a felony of the second degree and one count of having a weapon under disability in violation of R.C. 2923.13(A)(2), a felony of the first degree. The last count was later amended to correct a typographical error and reflect that this was a felony of the third degree. All counts contained firearm and repeat violent offender specifications.
 {¶ 6} On August 8, 2005, Appellant filed a motion to suppress statements. The trial court held a hearing on Appellant's motion and subsequently denied the motion. On April 6, 2006, Appellant filed a motion to determine competency and a motion to continue the trial. Appellant was referred for a competency evaluation. The court held a hearing on the matter and determined that Appellant was competent to stand trial. Trial before a jury commenced on April 11, 2006. The jury returned guilty verdicts on all counts. The trial court held the sentencing hearing on April 17, 2006. Appellant was sentenced to incarceration for fifteen years to life for his conviction under R.C.2903.02(A). Appellant's convictions under R.C. 2903.02(B) and R.C.2903.11(A)(1) (2) were allied with count one, *Page 4 
including the specifications. Appellant was sentenced to five years incarceration for his conviction for having weapons under disability in violation of R.C. 2923.13(A)(2). The trial court ordered that Appellant serve these sentences consecutively. The trial court additionally sentenced Appellant to three years incarceration for the firearm specifications on the murder conviction under R.C. 2903.02(A) and three years incarceration for the repeat violent offender specification to this same charge. Appellant's aggregate sentence was thirty years to life.
 II. ASSIGNMENT OF ERROR I "THE CONVICTIONS AS TO COUNT ONE (MURDER, R.C. 2903.02(A)), COUNT TWO (FELONY-MURDER, R.C. 2903.02(B)), AND COUNT THREE (FELONIOUS ASSAULT, R.C. 2903.11(A)) WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 7} In his first assignment of error, Appellant argues his convictions for murder, felony-murder and felonious assault were against the manifest weight of the evidence. We disagree.
 {¶ 8} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing State v. Thompkins (1997), *Page 5 78 Ohio St.3d 380, 390 (overruled on other grounds). When a defendant asserts that his convictions are against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 9} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id. A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than it supports the other. Thompkins, 78 Ohio St.3d at 387 (overruled on other grounds). Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id. at 388, quoting Tibbs v. Florida (1982), 457 U.S. 31, 42. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983), 20 Ohio App.3d 172,175; see also, Otten, 33 Ohio App.3d at 340. *Page 6 
 {¶ 10} R.C. 2903.02(A) provides that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.02(B) states that
 "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 11} To find Appellant guilty of murder under R.C. 2903.02(A), and/or felony murder R.C. 2903.02(B), the jury would have to find that Appellant purposely caused Ms. Dove's death and/or that Appellant knowingly caused serious physical harm to Ms. Dove which proximately resulted in her death. State v. Miller, 96 Ohio St.3d 384,2002-Ohio-4931, at syllabus (finding that "[f]elony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault, is supported by evidence that establishes that the defendant knowingly caused physical harm to the victim"). To find Appellant guilty of felonious assault, the jury had to find that Appellant knowingly caused physical harm to Ms. Dove or knowingly caused physical harm to Ms. Dove by means of a deadly weapon or dangerous ordnance. R.C.2903.11(A)(1) (2).
 {¶ 12} R.C. 2901.22 defines the culpable mental states in Ohio and provides:
 "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature. *Page 7 
 "(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 13} Appellant contends that the verdict is not supported by the manifest weight of the evidence because there is no evidence that he possessed the requisite mental state required for his convictions.
 {¶ 14} Dr. Matus, the Lorain County Coroner, testified on behalf of the State. Dr. Matus reported to the crime scene on March 7, 2005. Once he arrived he performed various tests on Ms. Dove, including a determination of her body temperature, which led him to the conclusion that she had expired around 10:30 p.m. on March 6, 2005. Dr. Matus performed the autopsy of Ms. Dove. During the autopsy, Dr. Matus discovered an external, entrance gunshot wound to Ms. Dove's left flank area, just below the tip of her left rib. Dr. Matus testified that the bullet traveled from the rear to the front of Ms. Dove's body. The way in which the bullet entered her body severed the aorta, causing her to bleed to death. He additionally discovered that she had experienced a blunt force trauma to the top of her head. This trauma crushed the tissue in that region. The trauma to her head caused her to bleed. Consequently, Dr. Matus concluded that Ms. Dove sustained the head injury prior to her death.
 {¶ 15} Dr. Matus also performed toxicology tests on Ms. Dove. Tests results revealed that her blood contained a very small amount of an amphetamine *Page 8 
drug and a negligible amount of marijuana. Dr. Matus opined that the amphetamine may be attributed to an over the counter cold or cough suppressant.
 {¶ 16} Appellant could not be located after Ms. Dove's death. Deputy Jason Smith of the Lorain County Sheriff's Office testified that he participated in apprehending Appellant on March 7, 2005. On that date, officers obtained information that led them to the El Dorado Motel in Garfield Heights, Ohio where they discovered Appellant. Deputy Smith was stationed behind Appellant's motel room where he was conducting surveillance. Several other officers were stationed by the front of the room. When the officers entered the motel room, Deputy Smith observed Appellant, through a window, run into the bathroom to hide from the officers. The officers ordered Appellant to come out of the bathroom. Appellant eventually complied. The officers then arrested Appellant. Officer Smith transported Appellant to the Lorain County Jail. Deputy Smith testified that during the ride to the Lorain County Jail, Appellant remained silent. Appellant did not complain of any physical injuries and Deputy Smith did not observe any physical injuries to Appellant. Appellant appeared to be under the influence of some type of substance. Deputy Smith testified that he again encountered Appellant when he transported him to and from a court appearance. Appellant refused to leave the court until he was provided with a photograph of Ms. Dove. Deputy Smith told Appellant to remove the photograph from his jacket because booking officers would take the jacket from him upon re-admission to the jail. *Page 9 
When Deputy Smith stated that Appellant had forgotten to remove the photograph from his jacket, Appellant replied that he was not going to forget the picture. According to Deputy Smith, Appellant said, "`[s]he is the one that I murdered.'"
 {¶ 17} Deputy VanSant of the Lorain County Sheriffs Office also testified for the State. Deputy VanSant was working as the booking officer at the jail when Appellant was presented for booking. Deputy VanSant attempted to have Appellant replace his street clothing for a suicide smock. Appellant was agitated, exhibited mood swings, paced the floor and cried. Appellant repeatedly resisted Deputy VanSant's attempts. When Deputy VanSant pressed Appellant to comply, Appellant replied "`I killed my girlfriend, I'll will [sic] kill you guys, too."
 {¶ 18} Special Agent John Saraya of the Bureau of Criminal Investigation and Identification ("BCI") testified on behalf of the State. He testified that he responded to the scene of the incident and collected evidence regarding Ms. Dove's death. Mr. Saraya testified that Ms. Dove's hands were not tested for gunshot residue. He explained that because of the position of the wound on her body, he determined that testing her hands for gunshot residue would not be relevant to the investigation. Mr. Saraya elaborated on this decision, explaining:
 "A. The thing we do primarily with a gunshot residue test is determine who handled the gun when it was discharged.
 "In a case like this, the proximity of the wound, the length of the weapon, she basically would have to hold it in some awkward position in this way if it was to be self-inflicted. We didn't locate any other indication of any other shots being fired in any way in the *Page 10 
house, no other spent casings, no other holes from bullets to indicate more than one round had been fired.
 "In this situation, there would be a strong possibility, proximity to her left side, that we make [sic] get a positive result on her left hand anyhow from the discharge of the gun itself, so we therefore decided we didn't think it would be necessary.
 "Q. Okay. It would take one terrific wingspan in order for someone to have inflicted a wound on themselves with this weapon, correct?
 "A. Yes, sir.
 "Q. And the wound, as far as you could observe, was not a contact wound?
 "A. I could not determine that exactly. The soot found on the coat would indicate a close proximity.
 "Q. Okay. Now, with respect to the soot found on the coat, you didn't find any corresponding soot on her hands, front or back, did you?
 "A. No, sir."
 {¶ 19} In addition, Michael Roberts, a forensic scientist assigned to the Firearms Bureau of BCI, testified for the State. Roberts' position at BCI entails identifying firearms and calculating distance from muzzle to garment to determine the distance between the victim and the firearm at the time of discharge. Roberts examined the gun used in the murder. Roberts explained that to discharge the gun, a person would "load the shot shell", "pull the trigger back to get it to fire", and "once the hammer is pulled back, to fire the weapon you have to pull the trigger."
 {¶ 20} In making muzzle to garment calculations, Roberts looks at the pattern of gunshot residue on the garment. Roberts testified that the closer the *Page 11 
firearm is to the garment at the time of discharge, the more constricted the gunshot residue pattern, and vice versa. Roberts examined the coat Ms. Dove wore at the time of the shooting. Based on his examination, he determined that Ms. Dove was shot at a distance of approximately more than six inches away but less than three feet away. Roberts also testified that the projectile that killed Ms. Dove was consistent with discharge from the firearm recovered from Appellant's home.
 {¶ 21} Appellant testified but presented no witnesses on his behalf. Appellant testified that he obtained the shotgun a few months before Ms. Dove's death. He admitted that he knew it was illegal for him to possess the firearm because he had a prior conviction for felonious assault. Appellant admitted that he loaded the shotgun the day before Ms. Dove died. He claimed to have placed it in his bedroom for protection from drug dealers from Elyria, Ohio.
 {¶ 22} Appellant acknowledged that Ms. Dove came to his house on March 6, 2005 and brought him food. He stated that she removed her shoes upon entering the house but did not remove her coat. He testified that upon her arrival, she immediately became upset with him and began yelling at him. She went into the bedroom. Appellant followed Ms. Dove into the bathroom. Appellant stated that Ms. Dove called him a "`crack head'" and a "`loser.'" In response, Appellant told Ms. Dove that she was a hypocrite, suggesting that she was under the influence of drugs at that time. Appellant testified that Ms. Dove then grabbed him by his hair and the two banged their heads together three times. The two were *Page 12 
hovering over the beds at this time. According to Appellant, this action caused Ms. Dove to bleed from her nose. He stated that the blood from Ms. Dove's nose dripped onto the comforter. He then grabbed a baseball bat and smashed a ceramic frog that had been sitting on top of the television set. Appellant wheeled the bat against the wall, placing two holes in the wall. Appellant denied hitting Ms. Dove with the bat. When he turned around, Ms. Dove was walking towards him, carrying the shotgun, with the barrel pointed towards him. He stated that Ms. Dove swung the shotgun at him a few times but missed hitting him. In response, he yelled at her to put the gun down. He then grabbed the end of the shotgun, tugged on it, and the shotgun discharged, striking Ms. Dove. Appellant testified that he was unsure how the gun discharged as he did not have his finger on the trigger. Specifically, Appellant testified:
 "A. I'm not sure, sir, how it ended up happening. Maybe with the impact of me, her swing it [sic] and once I grabbed it, we tugged and it accidentally went off.
 "I mean it happened so fast, it is hard to say if my fingernail hit it? Did it just fire? Or I probably, I might have hit the trigger, I'm not sure."
However, he agreed that shotguns do not discharge on their own and that a gun will only discharge if a person depresses the trigger. Appellant additionally admitted that the gun was already loaded and cocked back. Appellant could not reconcile his explanation that Ms. Dove was holding the barrel of the shotgun *Page 13 
when the gun discharged with the fact that no gunshot residue appeared on the sleeves of Ms. Dove's jacket.
 {¶ 23} Appellant testified that Ms. Dove fell where she was standing after the shotgun discharged. Appellant acknowledged that he knew she had died but rather than alert law enforcement to report the incident, he fled the scene because he "panicked." Appellant testified that before he fled the scene, he obtained his stash of Percocet from his other vehicle. He acknowledged that he consciously fled in his corvette down State Route 10 to Interstate 480. He then drove to Cleveland and eventually ended up at Lorain Avenue where he sought to purchase crack cocaine. Appellant encountered a woman who connected him with her drug contact. Appellant purchased drugs from the woman's contact. The woman then took him to the El Dorado Motel in Garfield Heights, Ohio. Appellant admitted that he then purchased more drugs from occupants at the motel. In addition, Appellant admitted that he hid in the bathroom when law enforcement arrived to apprehend him.
 {¶ 24} Appellant testified that he had no intention of hurting Ms. Dove and she had no intention of hurting him either. He also admitted that he never contacted Ms. Dove's family regarding her death to apologize. Appellant admitted that he informed Deputy Smith and Deputy VanSant that he had killed Ms. Dove. Appellant then denied killing Ms. Dove, asserting that her death was *Page 14 
an accident. He explained that he told the officers that he had killed Ms. Dove because he felt responsible because he had possession of the weapon.
 {¶ 25} To find Appellant guilty of murder and/or felony murder, the jury had to find that Appellant purposely caused Ms. Dove's death and/or that Appellant knowingly caused serious physical harm to Ms. Dove which proximately resulted in her death. Miller, supra, at syllabus. As previously indicated, to find Appellant guilty of felonious assault, the jury had to find that Appellant knowingly caused Ms. Dove serious physical harm or knowingly caused physical harm to Ms. Dove by means of a deadly weapon or dangerous ordnance.
 {¶ 26} Intent need not be proven by direct testimony. In reWashington (1998), 81 Ohio St.3d 337, 340. "The specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death."State v. Walker, 5th Dist. No. 2005-CA-00286, 2006-Ohio-6240, at ¶ 87. Further, "`[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence.'" Id. at ¶ 88, quoting State v. Turner (Dec. 30, 1997), 10th Dist. No. 97APA05-709, at *3.
 {¶ 27} The jury could certainly find that Appellant acted purposely and knowingly when he shot and killed Ms. Dove. Appellant's intent to kill may be inferred from the surrounding circumstances. Appellant testified that he possessed a loaded shotgun which was located in the bedroom where Ms. Dove allegedly *Page 15 
walked into shortly after entering the house. Multiple actions were required before the shotgun discharged. Contrary to Appellant's assertions, the shotgun could not have "accidentally" discharged. Moreover, the State presented evidence that it was physically improbable that Ms. Dove had been holding onto the gun when it discharged given the length of the gun and the length of her arm. In light of the testimony regarding the way in which the bullet entered Ms. Dove's body coupled with the multiple actions required to discharge the firearm., the jury could reasonably have determined that the shooting was not an accident.
 {¶ 28} In addition, the jury heard testimony from two officers that Appellant admitted to them that he had killed Ms. Dove. Further, Appellant acknowledged that he told both officers that he had killed Ms. Dove. We find that the evidence supported the jury's conclusion that Appellant knew that physical harm to Ms. Dove was probable and that Appellant specifically intended to cause Ms. Dove's death. Given the testimony, this is not a case where the evidence weighs heavily in favor of Appellant, meriting a new trial. Therefore, Appellant's convictions were not against the manifest weight of the evidence. Accordingly, Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRRED [SIC] BY SENTENCING [APPELLANT] TO SEVEN YEARS OF INCARCERATION PURSUANT TO R.C. 2929.14(D)(2)(b), AS THE `REPEAT VIOLENT OFFENDER' PENALTY ENHANCEMENT IS UNCONSTITUTIONAL." *Page 16 
 {¶ 29} In Appellant's second assignment of error, he contends that the trial court erred in sentencing him to seven years incarceration pursuant to R.C. 2929.14(D)(2)(b), as the repeat violent offender ("RVO") penalty enhancement is unconstitutional. We find that Appellant has failed to preserve this argument for our review.
 {¶ 30} This Court has stated:
 "In [State v.] Dudukovich, [9th Dist. No. 05CA008729, 2006-Ohio-1309], we found that [State v.] Foster, [109 Ohio St.3d 1, 2006-Ohio-856] held that portions of Ohio's sentencing guidelines were unconstitutional, but that the appellant did not properly preserve his constitutional challenge for appeal. Dudukovich at ¶ 21. We held that an appellant, if sentenced after Blakely [v. Washington (2004), 542 U.S. 296], waives his constitutional challenge to his sentence if he does not preserve the argument in the trial court. Id. at ¶¶ 22 and 24. This Court questioned `whether [the] Defendant raised a specific challenge to the constitutionality of Ohio's sentencing statutes in the trial court.' Id. at ¶ 24. We found that `[a]s Defendant failed to raise any objection below, let alone an objection specifically raising a constitutional challenge, he is precluded from raising such an argument for the first time on appeal' Id." State v. Smith, 9th Dist. No. 05CA008827, 2006-Ohio-2691, at ¶ 11.
 {¶ 31} Based on this Court's holding in Dudukovich, we find that Appellant did not properly preserve his argument for appeal. SeeState v. Duffield, 9th Dist. No. 22634, 2006-Ohio-1823, at ¶¶ 72-75
(holding that when the appellant did not specifically object to the constitutionality of a statute after sentencing in trial court he waived that argument on appeal). In this case, the record indicates that Appellant was sentenced on April 17, 2006, after Blakely was decided. Appellant failed to object in the trial court to his sentence after it was ordered. Based on the *Page 17 
holding in Dudukovich that a party must object to preserve errors for review, this Court finds that Appellant is precluded from challenging his sentence on appeal.[1] See Smith, supra; Duffield, supra, ¶ 74;State v. Wade, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351, at ¶ 43.
 {¶ 32} Appellant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III "TRIAL COURT COMMITTED PREJUDICIAL ERROR AND DENIED [APPELLANT] HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN IT REFUSED HIS REQUESTS FOR JURY INSTRUCTIONS THEREBY VIOLATING HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, § 10 OF THE OHIO CONSTITUTION."
 {¶ 33} In his third assignment of error, Appellant contends that the trial court erred in failing to give his requested jury instructions in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution. More specifically, Appellant contends that the trial *Page 18 
court erred in refusing to instruct the jury regarding reckless homicide, voluntary manslaughter and accident. We disagree.
 {¶ 34} Generally, a trial court should give the requested instructions if they are correct statements of law applicable to the facts of the case, and reasonable minds may reach the conclusion sought. State v.Mills, 9th Dist. Nos. 02CA0037-M, 02CA0038-M, 2002-Ohio-7323, at ¶ 40. "When considering whether a trial court should have provided a requested jury instruction, an appellate court views the instructions as a whole." Id. at ¶ 39.
 {¶ 35} An appellate court respects the trial court's judgment on issues of jury instructions absent an abuse of discretion. Id. An abuse of discretion is "`more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.'" Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157. An appellate court may not substitute its judgment for that of the trial court.Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
Accident
 {¶ 36} Appellant contends that the trial court erred in failing to give an accident instruction as requested. Accident is not an affirmative defense. Jones v. State (1894), 51 Ohio St. 331, 342. Rather, the defense of accident is akin to a denial that an unlawful act was committed; it is not a justification for the defendant's admitted conduct. State v. Poole (1973), 33 Ohio St.2d 18, 19-20. An *Page 19 
accident is an event "that occurs unintentionally and without any design or purpose to bring it about." State v. Fears (1999), 86 Ohio St.3d 329,340. In order for an accident to occur, it must have been a physical event which would not be reasonably anticipated as a result of a lawful act. State v. Ross (1999), 135 Ohio App.3d 262, 276. A party is entitled to an accident instruction when evidence is presented at trial that the party's action was an accident. State v. Thomas (1988),40 Ohio St.3d 213, 218.
 {¶ 37} Appellant contends that an accident instruction was warranted because Appellant testified that a struggle over the gun occurred between him and Ms. Dove wherein he grabbed it and it "accidentally" discharged.
 {¶ 38} We find no abuse of discretion in the trial court's decision not to instruct the jury regarding accident. The State presented overwhelming evidence that Ms. Dove's death was not an accident. The State presented expert testimony that the shotgun required multiple actions to be discharged and that the shotgun could not have "accidentally" discharged. Further, the State presented evidence that the bullet traveled from the back to the front of Ms. Dove's body and that it was physically improbable that Ms. Dove had been holding onto the gun when it discharged given the length of the gun and the length of her arm. Such evidence rebuts Appellant's assertion that a struggle ensued wherein the two were fighting over the gun and it accidentally discharged.
 Reckless Homicide *Page 20 
 {¶ 39} Appellant also contends that the trial court erred in failing to give the requested reckless homicide instruction. Pursuant to R.C.2903.02(B), reckless homicide is a lesser included offense of murder and felony murder. Reckless homicide is defined under R.C. 2903.041, which provides:
 "(A) No person shall recklessly cause the death of another or the unlawful termination of another's pregnancy."
Pursuant to R.C. 2901.22(C), a person acts recklessly when
 "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."
The trial court determined that the facts did not warrant a reckless homicide instruction because "there is not evidence of recklessness that has been shown here, even of a minimal nature."
 {¶ 40} While a crime may constitute a lesser included offense, it does not follow that a lesser included offense instruction is mandatory; "[a]n instruction on a lesser-included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense." State v. Carter (2000), 89 Ohio St.3d 593, 600.
 {¶ 41} The State presented ample evidence that Appellant intentionally murdered Ms. Dove. The State presented expert testimony that the shotgun required multiple actions to be discharged and that the shotgun could not have "accidentally" discharged. This evidence rebuts Appellant's assertion that he acted recklessly. In addition to the evidence that it was physically improbable that *Page 21 
Ms. Dove had been holding onto the gun when it discharged given the length of the gun and the length of her arm, testimony regarding the way in which the bullet entered Ms. Dove's body, and the lack of evidence of a struggle, the State also presented evidence that Appellant admitted to two officers that he had killed Ms. Dove. Appellant did not deny these admissions.
 {¶ 42} Given the testimony regarding the way in which the bullet entered Ms. Dove's body coupled with the lack of gunshot residue on the sleeves of Ms. Dove's coat, the jury could reasonably find that the shooting was intentional. The State presented evidence that it was physically improbable that Ms. Dove had been holding onto the gun when it discharged given the length of the gun and the length of her arm.
 {¶ 43} Therefore, Appellant could not demonstrate that the evidence supported both an acquittal on the crime charged (murder) and a conviction on the lesser included offense (reckless homicide). Moreover, any error in declining to give this instruction is harmless as we have determined that Appellant's conviction was supported by the manifest weight of the evidence. State v. Elliott (1993), 91 Ohio App.3d 763,771, citing State v. Lytle (1976), 48 Ohio St.2d 391, at paragraph three of the syllabus. An instruction on reckless homicide would not have changed the outcome as Appellant was appropriately convicted of murder, the more egregious offense. *Page 22 
 {¶ 44} As a result, under the facts and circumstances presented here, we cannot say that the trial court's refusal to give an instruction on the lesser included offense was unreasonable or arbitrary.
Voluntary Manslaughter
 {¶ 45} The record reflects that the trial court declined to give a voluntary manslaughter instruction. The trial court explained:
 "I think you are in the same position as the Reckless Homicide * * *, in that that doesn't coincide with what your client testified to. He has not discussed any sudden passion or fit of rage on your behalf. He says it was an accident."
 {¶ 46} Voluntary manslaughter is defined in R.C. 2903.03(A):
 "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another[.]"
 {¶ 47} Voluntary manslaughter is not a lesser-included offense of murder, but rather is an inferior degree of murder. State v. Tyler
(1990), 50 Ohio St.3d 24, 36. Nonetheless, when determining whether an instruction on voluntary manslaughter should have been given, we apply the same test utilized when determining whether an instruction on a lesser-included offense should have been given. State v. Shane (1992),63 Ohio St.3d 630, 632. An instruction on voluntary manslaughter is appropriate when "the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." Id. *Page 23 
 {¶ 48} The trial court should have given an instruction on voluntary manslaughter if the evidence presented at trial demonstrated that Appellant had killed Ms. Dove while under the influence of a sudden passion or fit of rage caused by provocation from Ms. Dove that was serious enough to incite him into using deadly force. Appellant set forth no evidence or testimony to demonstrate that he killed Ms. Dove while under the influence of a sudden passion or fit of rage. Rather, he specifically testified that he did not know "how it ended up happening" and surmised that the gun may have "accidentally" discharged. Following our review of the record, we conclude that the trial court properly declined to give such an instruction.
 {¶ 49} Accordingly, the trial court did not abuse its discretion in refusing to give the requested jury instructions. Appellant's third assignment of error is overruled.
 III. {¶ 50} Appellant's assignments of error are overruled, and the judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal. We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into *Page 24 
execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30. Costs taxed to Appellant.
SLABY, P.J. CONCURS
[1] In his reply brief, Appellant argues that his sentence constitutes plain error and that his trial counsel was ineffective for failing to object to the additional RVO penalty. Appellant raises these issues for the first time in his reply brief. Pursuant to Loc.R. 7(D), reply briefs are restricted to matters in rebuttal of the appellee's brief. "Proper rebuttal is confined to new matters in the appellee's brief." Loc.R. 7(D). Appellant may not raise new assignments of error or new issues for consideration in his reply brief; rather, the reply brief is "merely an opportunity to reply to the brief of the appellee." State v.Palmison, 9th Dist. No. 20854, 2002-Ohio-2900, at ¶ 32, fn.2, quotingIn re Songer (Oct. 3, 2001), 9th Dist. No. 01CA007841, at *14. This Court, therefore, declines to address the issues of the trial court's plain error and ineffectiveness of his trial counsel, because these issues are not properly before us.